UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| HYDRADYNE, LLC, | ) | No. 7:19-CV-77 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GARY REYES, | ) | |
| and SAMUEL MELENDEZ, | ) | |
| | ) | |
| Defendants. | ) | |

## ORIGINAL COMPLAINT

Comes now plaintiff Hydradyne, LLC ("Hydradyne") and for its Complaint alleges as follows:

### A. Introduction

1. Hydradyne is a supplier of hydraulic equipment and services to the oilfield industry and other customers.

2. Two former employees in Hydradyne's Odessa, Texas branch office have quit their jobs with Hydradyne and seek to divert Hydradyne's existing business to a competitor, Austin Distributing and Manufacturing Corporation d/b/a Austin Hose ("Austin Hose"), in violation of their confidentiality and non-solicitation agreements with Hydradyne.

3. In this action, Hydradyne seeks immediate injunctive relief pending the commencement of an arbitration with JAMS pursuant to written arbitration agreements with its former employees.

4.   The relief requested by Hydradyne is appropriate and necessary to prevent immediate and irreparable harm to Hydradyne's business and to maintain the *status quo ante* pending the resolution of any disputes between the parties through contractually-mandated arbitration.

## B. Parties

5.   Plaintiff, Hydradyne, LLC ("Hydradyne"), is a Georgia limited liability company whose sole member is a Georgia corporation with its principal place of business in Georgia.

6.   Defendant, Gary Reyes ("Reyes"), is an individual resident of Odessa, Texas and was formerly the general manager of Hydradyne in its Odessa, Texas branch office.

7.   Reyes also had substantial involvement in customer sales for Hydradyne's Odessa, Texas branch office.

8.   Defendant, Samuel Melendez ("Melendez"), is an individual resident of Odessa, Texas and was formerly the senior sales representative of Hydradyne in its Odessa, Texas branch office.

## C. Jurisdiction and Venue

9.   The Court has jurisdiction of this action pursuant to 28 U.S.C. 1367.

10. The Court also has jurisdiction of this action pursuant to 28 U.S.C. § 1332 because Hydradyne is diverse in citizenship from both defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Specifically, this action involves in excess of $2 million in Hydradyne's revenues that are at risk if defendants are allowed to breach their contractual obligations and violate the law.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all defendants reside in this district and all or substantially all events giving rise to this action occurred in this district.

### D. Facts

12. Hydradyne markets and sells hydraulic equipment, hoses, and services to the oilfield industry and other industries throughout the Southwestern and Southeastern United States.

13. Hydradyne represents numerous manufacturers of fluid power equipment, including hydraulic equipment, power units, and hoses.

14. Hydradyne maintains the largest stock in the United States for Parker Hannifin ("Parker"), the world's leading manufacturer of hydraulic equipment.

15. Hydradyne has grown its business by establishing new branch offices in some areas and by acquiring existing businesses in other areas.

16. In the second quarter of 2014, Hydradyne established a new branch office in Odessa, Texas by purchasing all or substantially all of the assets of Hydraulic Sales & Service, Inc. ("HSS"), including the goodwill of HSS.

17. All or substantially all of HSS's employees went to work for Hydradyne after the asset sale, including defendants Reyes and Melendez.

18. Reyes and Melendez had both been employees of HSS since 2006.

19. On or about June 2, 2014, both Reyes and Melendez became employees of Hydradyne.

20. Hydradyne's industry is highly competitive and the labor market in that industry in the Odessa, Texas area is extremely tight.

21. The existing institutional knowledge, customer relationships, vendor relationships, and relationships with other employees held by Reyes and Melendez in 2014 were part of the goodwill acquired by Hydradyne when it purchased all or substantially all of HSS's assets.

22. In addition, Hydradyne provided Reyes and Melendez with education and training in the sales of hydraulic equipment and service and in Hydradyne's processes and procedures in those areas.

23. Further, Hydradyne provided Reyes and Melendez with confidential and proprietary information regarding customer lists, customer points of contact, marketing strategies, pricing strategies, pricing data, quotation preparation, and customer service processes.

24. Hydradyne depends on the loyalty of its employees not to disclose or misuse its confidential or proprietary information.

25. Hydradyne also requires each of its employees to sign a confidentiality and non-solicitation agreement.

26. , In connection with employment with Hydradyne at its Odessa, Texas location, Reyes signed a Non-Solicitation and Non-Disclosure Agreement, a copy of which is attached as Exhibit "1" to this Complaint ("the Reyes Agreement").[1]

27. , In connection with his employment with Hydradyne at its Odessa, Texas location, Melendez signed a Non-Solicitation and Non-Disclosure Agreement, a copy of which is attached as Exhibit "2" to this Complaint ("the Melendez Agreement").

28. Section 8 in both the Reyes Agreement and the Melendez Agreement was entitled "Customer Non-Solicitation" and provided that:

> Employee agrees that, for a period of two (2) years after termination of employment with Hydradyne, regardless of whether such termination is voluntary or involuntary, and within the Territory, Employee will not solicit any past, current, or prospective customers of Hydradyne, with whom Employee has had

---

[1]   Reyes later signed another, substantially identical agreement in connection with a promotion. Its application would not result in any material change to the allegations contained in this Complaint.

any direct and substantial contact during the last one (1) year of Employee's employment with Hydradyne.

29. Section 9 in both the Reyes Agreement and the Melendez Agreement was entitled "Vendor Non-Solicitation" and provided that:

> Employee agrees that, for a period of two (2) years after termination of employment with Hydradyne, regardless of whether such termination is voluntary or involuntary, Employee will not solicit any current vendors or suppliers of Hydradyne, with whom Employee has had any direct and substantial contact from within the Territory during the last one (1) year of Employee's employment with Hydradyne.

30. Section 10 in both the Reyes Agreement and the Melendez Agreement was entitled "Employee Non-Solicitation" and provided, in pertinent part, that:

> Employee agrees that, for a period of two (2) years after termination of employment with Hydradyne, regardless of whether such termination is voluntary or involuntary, Employee will not solicit, from within the Territory, or for employment or for involvement within the Territory in a business identical or similar to Hydradyne's Business, any current employees or independent contractors of Hydradyne, with whom Employee has had any direct and substantial contact during the last one (1) year of Employee's employment with Hydradyne, or any prospective employees of Hydradyne with whom Employee has had any direct and substantial contact during the last six (6) months of Employee's employment with Hydradyne.

31. Section 11 in both the Reyes Agreement and the Melendez Agreement was entitled "Confidential Information" and provided that:

> (a) "Confidential Information" means written or electronically stored materials or information that is made available to Employee by Hydradyne, and that Hydradyne does not publish to the general public in printed form, on Hydradyne's Web site, or in advertising to the public. (b) Confidential Information includes, without limitation, business ideas, business plans, names of actual clients or customers, names of prospective clients or customers, contact information for actual or prospective clients or customers, terms or conditions of any agreements or arrangements with clients or customers, proposed terms or conditions of any agreement or arrangement discussed with or proposed to any prospective client or customers, other information concerning actual or prospective clients or customers, financial or cost information, pricing information, information concerning profit margins, accounting information or systems, trade secrets, vendor-specific or customer-

specific pricing information, employee names, employee contact information, employee salaries, names of independent contractors, terms or conditions of any agreements or arrangements with independent contractors, names of suppliers or vendors, contact information for suppliers or vendors, terms or conditions of any agreements or arrangements with suppliers or vendors, business forecasts, proprietary ideas, inventions, business ideas, patentable ideas, drawings, illustrations, existing or contemplated products and services, research and development, manufacturing information, and marketing plans and strategies. (c) "Confidential Information" shall include "trade secrets'1 as that term is defined in the Texas Uniform Trade Secrets Act, V.T.C.A., Civil Practice & Remedies Code §§134a.001-134a.008 (2013). "Confidential Information" shall also include information that does not necessarily constitute a "trade secret" as that term is defined in the Texas Uniform Trade Secrets Act, and that may be partly public or partly known to one or more persons such as regular customers, but is not collectively or generally known to the public or any one party, such as customer lists, aggregate or overall pricing lists, and overall pricing strategies, methodologies, algorithms, and data. (d) Confidential Information does not include information that: (i) was in Employee's possession through independent, non-confidential sources and without any violation of the Employee's obligations under this Agreement; (ii) is or becomes a matter of public knowledge through no fault or act of Employee; or (iii) is developed by another person independently of any disclosures made by Employee.

32. Section 12 of each Agreement was entitled "Non-Disclosure" and provided that:

During the term of Employee's employment by Hydradyne, Employee agrees not to use or disclose any of Hydradyne's Confidential Information for any purpose not specifically authorized by Hydradyne. Upon termination of Employee's employment by Hydradyne, Employee agrees: (a) not to take or remove any of Hydradyne's Confidential Information, in any form, for any purpose, and (b) not to use or disclose, or allow the use or disclosure of, any of Hydradyne's Confidential Information by any third party, including but not limited to any business other than Hydradyne that is involved in the engineering, design, fabrication, sale, service, or repair of motion control and fluid power products and systems.

33. Section 14 of each Agreement was entitled "Injunctive Relief" and provided that:

Each party agrees that any actual or threatened violation of this Agreement would cause irreparable harm that cannot be remedied by monetary damages. Each party agrees that immediate, temporary, preliminary, and permanent injunctive or equitable relief is necessary and appropriate to halt or prevent any actual or threatened violation of this Agreement, as an exception to the otherwise mandatory arbitration provisions of this Agreement.

34. Section 18 of each Agreement was entitled "Arbitration" and provided that:

> Any and all disputes involving Employee and Hydradyne, and arising out of or related to this Agreement or the subject matter of this Agreement, shall be resolved by arbitration and not by any court. Any dispute involving the arbitrability of a dispute or issue arising out of or related to this Agreement shall also be decided by arbitration and not by a court. The sole exception to arbitration shall be the right of either party to seek immediate injunctive relief or specific performance to halt or prevent any actual or threatened irreparable harm, or to preserve the *status quo ante,* before or during arbitration. Arbitration shall be conducted as expeditiously as possible by a single JAMS arbitrator in Dallas, Texas, selected by mutual agreement of the parties or, failing such agreement, at the sole discretion of administrative personnel for JAMS. All arbitrations shall be conducted pursuant to the principles stated in the streamlines arbitration rules of JAMS (http://www.jamsadr.comhules-streamlinedarbitration/). Arbitration shall be conducted such that the arbitrator's final decision is rendered within sixty (60) days after either party seeks to commence arbitration. Discovery in any arbitration shall be limited to the production of documents and limited depositions. An arbitration hearing shall not exceed one (1) day in duration. The arbitration hearing shall be conducted in Dallas, Texas or in any other site to which the parties mutually agree. The arbitrator shall render a written decision within five (5) calendar days after conclusion of the arbitration.

35. On March 4, 2019, Reyes resigned from his employment with Hydradyne.

36. On March 5, 2019, Melendez followed suit, resigning from his employment with Hydradyne.

37. Before and after their resignations, Reyes and Melendez violated the expected loyalty protections and contractual obligations that Hydradyne relied upon.

38. On information and belief, Reyes and Melendez, before leaving their employment with Hydradyne, met in a public place with representatives of Austin Hose.

39. , Immediately after Reyes' resignation, Hydradyne's regional manager, Lonnie Smith ("Smith"), was told by the Fluidpower Sales Manager for Hydradyne's major vendor, Parker Hannifin, that Reyes had contacted Parker Hannifin shortly after resigning from Hydradyne. Such conduct constitutes a clear violation of his Agreement.

40. Smith was told by Parker's Sales Manager that Reyes specifically requested access to Parker Hannifin products, apparently with the aim of expanding the scope of business at Austin Hose into hydraulic services, to compete directly with Hydradyne. Upon information and belief, Austin Hose is not an approved distributor of Parker products.

41. In addition, Parker's Sales Manager told Smith that Austin Hose had separately inquired about obtaining wetline kits from Parker, and becoming a truck hydraulic center ("THC") for Parker, apparently with the idea of competing with Hydradyne in the provision of a broader range of hydraulic equipment and services. Upon information and belief, Austin does not currently offer or sell wetline kits.

42. Wetline kits are used when installing items such as booms or cranes on trucks or semi-trucks with power take offs ("PTOs").

43. Wetline kits consist of items such as hydraulic hose and fittings, reservoirs or tanks filters, control valves, pumps, and PTOs.

44. Hydradyne currently provides wetline kits to customers out of its Odessa, Texas branch office, and acts as a Parker THC.

45. To act as a THC in Odessa, Hydradyne must sometimes obtain equipment or supplies from its competitors in the Odessa, Texas area, including hydraulic hose purchased from Austin Hose.

46. In 2018, Hydradyne purchased approximately $500,000.00 in hydraulic hose from Austin Hose, for use by Hydradyne in work for its customers or simply for resale by Hydradyne to Hydradyne's own customers.

47. The discussions amongst Reyes, Melendez, Austin Hose, and Parker suggest Reyes and Melendez plan to misuse Hydradyne's confidential and proprietary information, acquired during

their employment with Hydradyne, to solicit Hydradyne's customers and vendors which is in violation of their Agreements.

48. Prior to resigning his position with Hydradyne, Reyes had boasted to his manager, Smith, that he would leave Hydradyne and empty out Hydradyne's Odessa Texas branch office by taking other employees with him.

49. In addition, "shop talk" in Hydradyne's Odessa, Texas branch office was that Reyes intended to raid employees from Hydradyne's Odessa Texas branch office.

50. On information and belief, Reyes and Melendez have caused several employees to leave their jobs at Hydradyne for the purpose of harming Hydradyne's business and/or later recruiting the employees to work for Austin Hose.

51. In addition to their plan to solicit at least one of Hydradyne's vendors, and to solicit Hydradyne's employees or at least disrupt Hydradyne's employment relationship with its employees, on information and belief, Reyes and Melendez seek to solicit Hydradyne's customers.

52. Prior to resigning Reyes specifically told his manager at Hydradyne, Lonnie Smith, that he (Reyes) would take with him all of the customer contact information on his personal cellphone when he left Hydradyne leaving Hydradyne with no information regarding specific customer contacts that Reyes had acquired while he was Hydradyne's general manager in Hydradyne's Odessa, Texas branch office. Reyes added that all of the customers would be calling he and Melendez, not Hydradyne.

53. In addition, when Reyes provided notice that he was resigning from his job with Hydradyne, Reyes told Smith that he was not sure where he would next go to work.

54. Reyes told Smith that his only immediate plans were to go on vacation for several weeks.

55. On March 7, 2019, just three days after Reyes' resignation, Smith drove past Austin Hose's Odessa, Texas location and saw Reyes' truck parked there.

56. Reyes' open threats to misappropriate confidential and proprietary information indicate an intent to misappropriate information, subvert vendor and employee and customer relationships, and cause harm to Hydradyne.

57. Hydradyne has been damaged, and faces the threat of irreparable damage, from the conduct of Reyes and Melendez, as described above.

58. Hydradyne has also suffered monetary damages as a result of the conduct of Reyes and Melendez, as described above.

59. The full extent of Hydradyne's harm is not yet known and cannot be easily calculated.

### Count I: Breach of Contract

60. Hydradyne repeats, realleges, and incorporates by reference the prior allegations of this Complaint, as if fully set forth herein.

61. Reyes entered into a written Non-Disclosure and Non-Solicitation Agreement with Hydradyne.

62. A copy of that Agreement is annexed as Exhibit "1" to this Complaint.("the Reyes Agreement").

63. Melendez likewise entered into a written Non-Disclosure and Non-Solicitation Agreement with Hydradyne ("the Melendez Agreement").

64. A copy of that Agreement is annexed as Exhibit "2" to this Complaint.

65. The Reyes Agreement and the Melendez Agreement are substantially identical in their substantive terms and are therefore simply referred to as "the Agreement," in the following allegations.

66. Sections 8, 9, and 10 of the Agreement, as more fully set forth above, prohibit the solicitation of customers, vendors, or employees by Reyes and Melendez.

67. By their actions, Reyes and Melendez have violated, and/or threaten to violate, the requirements of sections 8, 9, and 10 of the Agreement.

68. Sections 11 and 12 of the Agreement, as more fully set forth above, prohibit the misuse or disclosure of Hydradyne's confidential and proprietary information.

69. By their actions, Reyes and Melendez have violated, and/or threaten to violate, the requirements of sections 11 and 12 of the Agreement.

70. On information and belief, if the conduct of Reyes and Melendez is not remedied, and defendants are not enjoined, defendants will continue to violate their contractual obligations to Hydradyne under the Agreement, for defendants' own benefit and to Hydradyne's detriment.

71. As a direct and proximate result of defendants' breaches of contract, as alleged above, Hydradyne has suffered and, if the misconduct of defendants is not halted, will continue to suffer, irreparable injury and significant monetary damages, in an amount to be proven in arbitration.

72. Because Hydradyne's remedy at law is inadequate, Hydradyne seeks, in addition to monetary damages, temporary, preliminary, and permanent injunctive relief to halt defendants' breaches of contract and prevent any further breaches of contract.

73. Hydradyne's business is reliant on its business reputation and its ability to maintain and grow its client base in a competitive market.

74. Hydradyne's business will continue to suffer irreparable harm absent injunctive relief if this Court does not grant immediate injunctive relief to halt defendants' breaches of contract to the detriment of Hydradyne's reputation and ability to maintain and grow its client base.

75. Hydradyne has a substantial likelihood of success on the merits of its claims against Reyes and Melendez, because of Reyes' and Melendez's blatant, willful, and malicious breaches of contract as alleged in this Complaint.

76. Hydradyne has been damaged by the unlawful and improper acts of Reyes and Melendez and is entitled to monetary damages, in an amount to be determined in an arbitration of Hydradyne's claims.

77. Because defendants' breaches of contract have been willful and malicious, Hydradyne is further entitled to an award of punitive damages and attorneys' fees.

### Prayer for Relief

78. Plaintiff, Hydradyne, LLC, respectfully requests that the Court grant its Complaint against defendants, Gary Reyes and Samuel Melendez,  and grant the following relief:

(a) Refer to arbitration all claims amongst or between Hydradyne, Reyes, and Melendez, pursuant to the parties' written agreement(s) to arbitrate, and stay all further proceedings in this action;

OR, IN THE ALTERNATIVE

(b) Award Hydradyne all immediate injunctive relief, preliminary injunctive relief, permanent injunctive relief, monetary damages, attorneys' fees, costs, and other relief to which Hydradyne may be legally or equitably entitled.


Dated: March 19, 2019.

Respectfully submitted,

LYNCH, CHAPPELL & ALSUP
A Professional Corporation
The Summit, Suite 700
300 North Marienfeld
Midland, Texas 79701
Telephone: 432/683-3351
Telecopier: 432/683-2587


By:   /s/ Mary W. Baker
      Harper Estes
      State Bar No. 00000083
      hestes@lcalawfirm.com
      Mary W. Baker
      State Bar No. 24062598
      mbaker@lcalawfirm.com

      COUNSEL FOR PLAINTIFF,
      HYDRADYNE, LLC



# EXHIBIT   1

## NON-SOLICITATION AND NON-DISCLOSURE AGREEMENT

1.    **Parties.**    The parties to this Non-Solicitation and Non-Disclosure Agreement ("the Agreement") are Hydradyne, LLC ("Hydradyne"), a Georgia limited liability company with its headquarters in Fort Worth, Texas and **Gary Reves** ("Employee"), a resident of the State of Texas who is employed at the following Hydradyne location in Texas [*please check appropriate box*]:

- ☐ Dallas, Texas;
- ☐ Fort Worth, Texas;
- ☐ Waco, Texas;
- ☐ San Antonio, Texas;
- ☐ Houston, Texas; or
- ☒ Odessa, Texas

2.    **Purpose & Term.**    The purpose of this Agreement is to prevent Employee from taking customers, employees or vendors from Hydradyne after employment with Hydradyne, and from using or disclosing confidential, proprietary, or insider information, during or after employment with Hydradyne. The terms and conditions of this Agreement shall remain in force for the duration of Employee's employment by Hydradyne, and for a period of two (2) years after such employment ceases, regardless of whether employment ends voluntarily or involuntarily. **Nothing in this Agreement shall be construed or interpreted to alter the "at will" nature of Employee's employment by Hydradyne.**

3.    **Consideration.**    Employee agrees that Employee is receiving the following from Hydradyne, as the consideration for Employee agreeing to enter into this Agreement [*please check appropriate box*]:

- ☒ new employment with Hydradyne;
- ☐ promotion to new position with Hydradyne;
- ☐ increase in pay from Hydradyne; and/or
- ☐ receipt of confidential information and trade secrets from Hydradyne.

**Employee initials and date:** *GR    5-30-14*

4.    **Hydradyne's Business.**    The business of Hydradyne is motion control in general, embracing pneumatics, hydraulics, and electro-mechanical systems, and including system engineering, design, and fabrication; in-house and on-site service and repair; and product sales, principally in the oil and gas industry, pulp and paper, refuse disposal, mining, marine applications, bulk feed industry, stamping and forming, railway maintenance, construction equipment, general manufacturing, the hauling industry, the auto industry, communications support, timber, iron and steel, and mobile crane business ("Hydradyne's Business").

5.    **Other Definitions.**    The term "a business similar to Hydradyne's Business" shall mean work that is identical or substantially similar to Employee's Work for Hydradyne; or that

Exhibit 1

involves Employee's use or potential application of Hydradyne's design, pricing, product, marketing, sales, salary, or other business information used in Hydradyne's Business. The term "direct and substantial contact" shall mean, with regard to an employee, a working relationship with the employee (including but not limited to a direct or indirect reporting relationship, work in the same physical or business area of the company, and/or work with the same customers or vendors); frequent or occasional contact or communication in person, by email, by telephone, by text message, or otherwise; and/or familiarity with the employee's job duties and compensation (including but not limited to general amount of compensation, and whether compensation is by hourly wage or by salary). The term "direct and substantial contact" shall mean, with regard to a customer, a working relationship with the customer (including but not limited to placing or filling product or service orders); frequent or occasional contact or communication with one or more representatives of the customer, whether in person, by email, by telephone, by text message, or otherwise; and/or familiarity with the customer's product needs, service needs, and/or prices charged to that customer by Hydradyne. The term "direct and substantial contact" shall mean, with regard to a vendor, a working relationship with the vendor (including but not limited to placing or filling product orders); frequent or occasional contact or communication with one or more representatives of the vendor, whether in person, by email, by telephone, by text message, or otherwise; and/or familiarity with Hydradyne's purchases from the vendor and/or the prices paid to that vendor by Hydradyne.

6. **Employee's Work.** Employee's work for Employee's job, at the time Employee is signing this Agreement ("Work"), is in the area of [*check appropriate box below*]:

- [☑] sales for Hydradyne, which includes, but is not limited to, selling fluid power products and services to existing and new customers, including the design and recommendation of power units, troubleshooting of customer problems, and recommendation of customer solutions; or
- [ ] business administration for Hydradyne, which includes, but is not limited to, the handling of product shipments and receipts, customer orders and payments, employment-related matters for Hydradyne's employees, directives from Hydradyne's executive and local management, and customer inquiries and issues; or
- [ ] managing Hydradyne's business at the local level, which includes, but is not limited to, ensuring a positive experience for all of Hydradyne's customers; leading and directing the work of Hydradyne's employees; complying with Hydradyne's policies and procedures; identifying and recommending potential improvements in Hydradyne's policies and procedures; proactive problem solving with employees and customers; and helping Hydradyne meet its business goals; or
- [ ] service for Hydradyne, which includes, but is not limited to, the disassembly, assembly, and repair of components and equipment; the design and fabrication of components and equipment; and the troubleshooting, diagnosis and repair of equipment and equipment systems in the shop and at customer sites.

Employee's Work may change from time to time. At any particular time after signing this Agreement, Employee's Work will be most accurately and fully described by Employee's then-current job description, as maintained by Hydradyne's Human Resources department.

7.   **Territory.**  For purposes of this Agreement, the term "Territory" shall mean the following [*please check appropriate box*]:

☐  for the Dallas, Texas and Fort Worth, Texas offices, the portions of north Texas, northeast Texas, and west Texas that extend:
- east to Longview, Texas, or approximately 165 miles;
- north to Oklahoma, or approximately 100 miles;
- west to Lubbock, Texas and Odessa, Texas, or approximately 375 miles;
- southeast to Corsicana, Texas and to Nacogdoches, Texas, or approximately 200 miles; and
- south to Waco, Texas, or approximately 80 miles;

☐  for the Waco, Texas office, the portions of central Texas that extend:
- south to Bryan, Texas, or approximately 50 miles;
- southwest to Austin, Texas, or approximately 100 miles; and
- in other directions for a distance of approximately 75 miles.

☐  for the San Antonio, Texas office, the portion of southern Texas that extends:
- north or northeast to Austin, Texas, or approximately 80 miles;
- northwest to San Angelo, Texas, or approximately 200 miles;
- southeast to Corpus Christi, Texas, or approximately 125 miles; and
- south to Brownsville, Texas, or approximately 250 miles.

☐  for the Houston, Texas office, the portion of east Texas area that extends:
- northwest to Bryan, Texas, or approximately 100 miles;
- east and northeast to Beaumont, Texas, or approximately 100 miles;
- northeast to Nacogdoches, Texas, or approximately 150 miles; and
- southwest to Corpus Christi, Texas, or approximately 200 miles.

☒  for the Odessa, Texas office, the portion of west Texas area that extends:
- north to Lubbock, Texas, or approximately 125 miles;
- east to San Angelo, Texas, or approximately 125 miles;
- northwest to Carlsbad, New Mexico, or approximately 150 miles; and
- south to Sanderson, Texas, or approximately 150 miles.

8.   **Customer Non-Solicitation.**  Employee agrees that, for a period of two (2) years after termination of employment with Hydradyne, regardless of whether such termination is voluntary or involuntary, and within the Territory, Employee will not solicit any past, current, or prospective customers of Hydradyne, with whom Employee has had any direct and substantial contact during the last one (1) year of Employee's employment with Hydradyne.

9.   **Vendor Non-Solicitation.**  Employee agrees that, for a period of two (2) years after termination of employment with Hydradyne, regardless of whether such termination is voluntary or involuntary, Employee will not solicit any current vendors or suppliers of Hydradyne, with whom Employee has had any direct and substantial contact from within the Territory during the last one (1) year of Employee's employment with Hydradyne.

10.   **Employee Non-Solicitation.**  Employee agrees that, for a period of two (2) years after termination of employment with Hydradyne, regardless of whether such termination is voluntary or involuntary, Employee will not solicit, from within the Territory, or for employment or for involvement within the Territory in a business identical or similar to Hydradyne's Business, any current employees or independent contractors of Hydradyne, with whom Employee has had any direct and substantial contact during the last one (1) year of Employee's employment with Hydradyne, or any prospective employees of Hydradyne with whom Employee has had any direct and substantial contact during the last six (6) months of Employee's employment with Hydradyne.

11.   **Hydradyne's Confidential Information.**  (a) "Confidential Information" means written or electronically stored materials or information that is made available to Employee by Hydradyne, and that Hydradyne does not publish to the general public in printed form, on Hydradyne's Web site, or in advertising to the public.  (b) Confidential Information includes, without limitation, business ideas, business plans, names of actual clients or customers, names of prospective clients or customers, contact information for actual or prospective clients or customers, terms or conditions of any agreements or arrangements with clients or customers, proposed terms or conditions of any agreement or arrangement discussed with or proposed to any prospective client or customers, other information concerning actual or prospective clients or customers, financial or cost information, pricing information, information concerning profit margins, accounting information or systems, trade secrets, vendor-specific or customer-specific pricing information, employee names, employee contact information, employee salaries, names of independent contractors, terms or conditions of any agreements or arrangements with independent contractors, names of suppliers or vendors, contact information for suppliers or vendors, terms or conditions of any agreements or arrangements with suppliers or vendors, business forecasts, proprietary ideas, inventions, business ideas, patentable ideas, drawings, illustrations, existing or contemplated products and services, research and development, manufacturing information, and marketing plans and strategies.  (c) "Confidential Information" shall include "trade secrets" as that term is defined in the Texas Uniform Trade Secrets Act, V.T.C.A., Civil Practice & Remedies Code §§134a.001-134a.008 (2013). "Confidential Information" shall also include information that does not necessarily constitute a "trade secret" as that term is defined in the Texas Uniform Trade Secrets Act , and that may be partly public or partly known to one or more persons such as regular customers, but is not collectively or generally known to the public or any one party, such as customer lists, aggregate or overall pricing lists, and overall pricing strategies, methodologies, algorithms, and data.  (d) Confidential Information does <u>not</u> include information that:  (i) was in Employee's possession through independent, non-confidential sources and without any violation of the Employee's obligations under this Agreement; (ii) is or becomes a matter of public knowledge through no fault or act of Employee; or (iii) is developed by another person independently of any disclosures made by Employee.

12.   **Non-Disclosure.**  During the term of Employee's employment by Hydradyne, Employee agrees not to use or disclose any of Hydradyne's Confidential Information for any purpose not specifically authorized by Hydradyne. Upon termination of Employee's employment by Hydradyne, Employee agrees:  (a) not to take or remove any of Hydradyne's

Confidential Information, in any form, for any purpose, and (b) not to use or disclose, or allow the use or disclosure of, any of Hydradyne's Confidential Information by any third party, including but not limited to any business other than Hydradyne that is involved in the engineering, design, fabrication, sale, service, or repair of motion control and fluid power products and systems.

13.   **Legal Process & Confidential Information.** If Employee receives a subpoena or other order, process, or papers from a court, regulatory body, or other governmental authority, or from a private party to any lawsuit or alternative dispute resolution procedure ("Legal Process") that Employee believes, in good faith, to demand the disclosure of Confidential Information, Employee shall promptly notify Hydradyne and allow Hydradyne to oppose or limit such Legal Process. Employee shall cooperate fully with Hydradyne in seeking to oppose or limit any such Legal Process.

14.   **Injunctive Relief.** Each party agrees that any actual or threatened violation of this Agreement would cause irreparable harm that cannot be remedied by monetary damages. Each party agrees that immediate, temporary, preliminary, and permanent injunctive or equitable relief is necessary and appropriate to halt or prevent any actual or threatened violation of this Agreement, as an exception to the otherwise mandatory arbitration provisions of this Agreement.

15.   **Assignment.** Neither party may assign or transfer its rights or obligations under this Agreement without the other party's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed. Notwithstanding the foregoing sentence, Hydradyne may assign or transfer all of its rights or obligations under this Agreement to any affiliate of Hydradyne or to any purchaser of all or substantially all of the assets or ownership interests of Hydradyne, without notice to Employee. This Agreement shall inure to the benefit of, and shall be binding upon, the parties and their respective successors and assignees, if any.

16.   **Severability of Restrictive Covenants.** To the extent that any provision or portion of this Agreement shall be held, found, or deemed to be unenforceable, then any such provision or portion of the Agreement shall be severed or modified to the extent necessary to be legally enforceable to the fullest extent permitted by applicable law. Employee expressly authorizes any court or arbitral tribunal of competent jurisdiction to sever or modify any such provision or portion of this Agreement.

17.   **Governing Law.** This Agreement shall be interpreted and enforced under the laws of the United States of America and the State of Texas, not including any conflicts of laws rules of Texas that would result in the application of the substantive laws of a jurisdiction other than Texas.

18.   **Arbitration.** Any and all disputes involving Employee and Hyradyne, and arising out of or related to this Agreement or the subject matter of this Agreement, shall be resolved by arbitration and not by any court. Any dispute involving the arbitrability of a dispute or issue arising out of or related to this Agreement shall also be decided by arbitration and not by a court. The sole exception to arbitration shall be the right of either party to seek immediate injunctive relief or specific performance to halt or prevent any actual or threatened irreparable

harm, or to preserve the *status quo ante*, before or during arbitration. Arbitration shall be conducted as expeditiously as possible by a single JAMS arbitrator in Dallas, Texas, selected by mutual agreement of the parties or, failing such agreement, at the sole discretion of administrative personnel for JAMS. All arbitrations shall be conducted pursuant to the principles stated in the streamlines arbitration rules of JAMS (http://www.jamsadr.com/rules-streamlined-arbitration/). Arbitration shall be conducted such that the arbitrator's final decision is rendered within sixty (60) days after either party seeks to commence arbitration. Discovery in any arbitration shall be limited to the production of documents and limited depositions. An arbitration hearing shall not exceed one (1) day in duration. The arbitration hearing shall be conducted in Dallas, Texas or in any other site to which the parties mutually agree. The arbitrator shall render a written decision within five (5) calendar days after conclusion of the arbitration.

19.  **Enforcement & Interpretation.** Employee agrees that he or she has been provided with an opportunity to: (a) review all terms and conditions of this Agreement, (b) obtain legal counsel and advice regarding this Agreement, and (c) request any changes to this Agreement deemed advisable by Employee or Employee's counsel. Employee therefore agrees that no provision of this Agreement shall be interpreted more strictly or less favorably against Hydradyne, as the drafter of this Agreement.

20.  **General Provisions.** This Agreement is the parties' entire agreement regarding non-solicitation of customers, employees, and vendors, and non-disclosure of confidential and proprietary information. This Agreement supersedes and controls any prior or subsequent written or oral agreements, communications, or understandings with regard to that subject matter. The terms of this Agreement may only be modified in a writing signed by both parties. No indulgence extended by either party shall be construed as a waiver of any breach by the other party, nor shall any waiver of one breach be construed as a waiver of any rights or remedies with respect to any subsequent breach. If any provision of this Agreement shall be adjudged void, invalid or unenforceable by a court of competent jurisdiction, the remainder of the Agreement shall continue and remain in full force and effect.

By the signatures provided below, both parties warrant and represent that they have read, understood, and agreed to all terms and conditions of this Agreement.

Date: _5 - 30 -14_

**Gary Reyes** ("Employee"):        Hydradyne:

_____         *Kimberly A. Clark*
*Signature*                                  *Signature*

                                               **Kimberly A. Clark**
                                               Name

                                               **Human Resources**
                                               Title

_____         _____
*Witness Signature*                    Witness Name

_____         _____
*Witness Signature*                    Witness Name

# EXHIBIT   2

## NON-SOLICITATION AND NON-DISCLOSURE AGREEMENT

1.  **Parties.**  The parties to this Non-Solicitation and Non-Disclosure Agreement ("the Agreement") are Hydradyne, LLC ("Hydradyne"), a Georgia limited liability company with its headquarters in Fort Worth, Texas and **Samuel Melendez** ("Employee"), a resident of the State of Texas who is employed at the following Hydradyne location in Texas [*please check appropriate box*]:

☐ Dallas, Texas;

☐ Fort Worth, Texas;

☐ Waco, Texas;

☐ San Antonio, Texas;

☐ Houston, Texas; or

☒ Odessa, Texas

2.  **Purpose & Term.**  The purpose of this Agreement is to prevent Employee from taking customers, employees or vendors from Hydradyne after employment with Hydradyne, and from using or disclosing confidential, proprietary, or insider information, during or after employment with Hydradyne.  The terms and conditions of this Agreement shall remain in force for the duration of Employee's employment by Hydradyne, and for a period of two (2) years after such employment ceases, regardless of whether employment ends voluntarily or involuntarily.  **Nothing in this Agreement shall be construed or interpreted to alter the "at will" nature of Employee's employment by Hydradyne.**

3.  **Consideration.**  Employee agrees that Employee is receiving the following from Hydradyne, as the consideration for Employee agreeing to enter into this Agreement [*please check appropriate box*]:

☒ new employment with Hydradyne;

☐ promotion to new position with Hydradyne;

☐ increase in pay from Hydradyne; and/or

☐ receipt of confidential information and trade secrets from Hydradyne.

**Employee initials and date:** SM

4.  **Hydradyne's Business.**  The business of Hydradyne is motion control in general, embracing pneumatics, hydraulics, and electro-mechanical systems, and including system engineering, design, and fabrication; in-house and on-site service and repair; and product sales, principally in the oil and gas industry, pulp and paper, refuse disposal, mining, marine applications, bulk feed industry, stamping and forming, railway maintenance, construction equipment, general manufacturing, the hauling industry, the auto industry, communications support, timber, iron and steel, and mobile crane business ("Hydradyne's Business").

5.  **Other Definitions.**  The term "a business similar to Hydradyne's Business" shall mean work that is identical or substantially similar to Employee's Work for Hydradyne; or that

Exhibit 2

involves Employee's use or potential application of Hydradyne's design, pricing, product, marketing, sales, salary, or other business information used in Hydradyne's Business. The term "direct and substantial contact" shall mean, with regard to an employee, a working relationship with the employee (including but not limited to a direct or indirect reporting relationship, work in the same physical or business area of the company, and/or work with the same customers or vendors); frequent or occasional contact or communication in person, by email, by telephone, by text message, or otherwise; and/or familiarity with the employee's job duties and compensation (including but not limited to general amount of compensation, and whether compensation is by hourly wage or by salary). The term "direct and substantial contact" shall mean, with regard to a customer, a working relationship with the customer (including but not limited to placing or filling product or service orders); frequent or occasional contact or communication with one or more representatives of the customer, whether in person, by email, by telephone, by text message, or otherwise; and/or familiarity with the customer's product needs, service needs, and/or prices charged to that customer by Hydradyne. The term "direct and substantial contact" shall mean, with regard to a vendor, a working relationship with the vendor (including but not limited to placing or filling product orders); frequent or occasional contact or communication with one or more representatives of the vendor, whether in person, by email, by telephone, by text message, or otherwise; and/or familiarity with Hydradyne's purchases from the vendor and/or the prices paid to that vendor by Hydradyne.

      6.    **Employee's Work.** Employee's work for Employee's job, at the time Employee is signing this Agreement ("Work"), is in the area of [*check appropriate box below*]:

- ☒ sales for Hydradyne, which includes, but is not limited to, selling fluid power products and services to existing and new customers, including the design and recommendation of power units, troubleshooting of customer problems, and recommendation of customer solutions; or
- ☐ business administration for Hydradyne, which includes, but is not limited to, the handling of product shipments and receipts, customer orders and payments, employment-related matters for Hydradyne's employees, directives from Hydradyne's executive and local management, and customer inquiries and issues; or
- ☐ managing Hydradyne's business at the local level, which includes, but is not limited to, ensuring a positive experience for all of Hydradyne's customers; leading and directing the work of Hydradyne's employees; complying with Hydradyne's policies and procedures; identifying and recommending potential improvements in Hydradyne's policies and procedures; proactive problem solving with employees and customers; and helping Hydradyne meet its business goals; or
- ☐ service for Hydradyne, which includes, but is not limited to, the disassembly, assembly, and repair of components and equipment; the design and fabrication of components and equipment; and the troubleshooting, diagnosis and repair of equipment and equipment systems in the shop and at customer sites.

Employee's Work may change from time to time. At any particular time after signing this Agreement, Employee's Work will be most accurately and fully described by Employee's then-current job description, as maintained by Hydradyne's Human Resources department.

7.    **Territory**.  For purposes of this Agreement, the term "Territory" shall mean the following [*please check appropriate box*]:

☐ for the Dallas, Texas and Fort Worth, Texas offices, the portions of north Texas, northeast Texas, and west Texas that extend:
- east to Longview, Texas, or approximately 165 miles;
- north to Oklahoma, or approximately 100 miles;
- west to Lubbock, Texas and Odessa, Texas, or approximately 375 miles;
- southeast to Corsicana, Texas and to Nacogdoches, Texas, or approximately 200 miles; and
- south to Waco, Texas, or approximately 80 miles;

☐ for the Waco, Texas office, the portions of central Texas that extend:
- south to Bryan, Texas, or approximately 50 miles;
- southwest to Austin, Texas, or approximately 100 miles; and
- in other directions for a distance of approximately 75 miles.

☐ for the San Antonio, Texas office, the portion of southern Texas that extends:
- north or northeast to Austin, Texas, or approximately 80 miles;
- northwest to San Angelo, Texas, or approximately 200 miles;
- southeast to Corpus Christi, Texas, or approximately 125 miles; and
- south to Brownsville, Texas, or approximately 250 miles.

☐ for the Houston, Texas office, the portion of east Texas area that extends:
- northwest to Bryan, Texas, or approximately 100 miles;
- east and northeast to Beaumont, Texas, or approximately 100 miles;
- northeast to Nacogdoches, Texas, or approximately 150 miles; and
- southwest to Corpus Christi, Texas, or approximately 200 miles.

☒ for the Odessa, Texas office, the portion of west Texas area that extends:
- north to Lubbock, Texas, or approximately 125 miles;
- east to San Angelo, Texas, or approximately 125 miles;
- northwest to Carlsbad, New Mexico, or approximately 150 miles; and
- south to Sanderson, Texas, or approximately 150 miles.

8.    **Customer Non-Solicitation**.  Employee agrees that, for a period of two (2) years after termination of employment with Hydradyne, regardless of whether such termination is voluntary or involuntary, and within the Territory, Employee will not solicit any past, current, or prospective customers of Hydradyne, with whom Employee has had any direct and substantial contact during the last one (1) year of Employee's employment with Hydradyne.

9.    **Vendor Non-Solicitation**.  Employee agrees that, for a period of two (2) years after termination of employment with Hydradyne, regardless of whether such termination is voluntary or involuntary, Employee will not solicit any current vendors or suppliers of Hydradyne, with whom Employee has had any direct and substantial contact from within the Territory during the last one (1) year of Employee's employment with Hydradyne.

10.   **Employee Non-Solicitation.**  Employee agrees that, for a period of two (2) years after termination of employment with Hydradyne, regardless of whether such termination is voluntary or involuntary, Employee will not solicit, from within the Territory, or for employment or for involvement within the Territory in a business identical or similar to Hydradyne's Business, any current employees or independent contractors of Hydradyne, with whom Employee has had any direct and substantial contact during the last one (1) year of Employee's employment with Hydradyne, or any prospective employees of Hydradyne with whom Employee has had any direct and substantial contact during the last six (6) months of Employee's employment with Hydradyne.

11.   **Hydradyne's Confidential Information.**  (a)  "Confidential Information" means written or electronically stored materials or information that is made available to Employee by Hydradyne, and that Hydradyne does not publish to the general public in printed form, on Hydradyne's Web site, or in advertising to the public.  (b)  Confidential Information includes, without limitation, business ideas, business plans, names of actual clients or customers, names of prospective clients or customers, contact information for actual or prospective clients or customers, terms or conditions of any agreements or arrangements with clients or customers, proposed terms or conditions of any agreement or arrangement discussed with or proposed to any prospective client or customers, other information concerning actual or prospective clients or customers, financial or cost information, pricing information, information concerning profit margins, accounting information or systems, trade secrets, vendor-specific or customer-specific pricing information, employee names, employee contact information, employee salaries, names of independent contractors, terms or conditions of any agreements or arrangements with independent contractors, names of suppliers or vendors, contact information for suppliers or vendors, terms or conditions of any agreements or arrangements with suppliers or vendors, business forecasts, proprietary ideas, inventions, business ideas, patentable ideas, drawings, illustrations, existing or contemplated products and services, research and development, manufacturing information, and marketing plans and strategies.  (c)  "Confidential Information" shall include "trade secrets" as that term is defined in the Texas Uniform Trade Secrets Act, V.T.C.A., Civil Practice & Remedies Code §§134a.001-134a.008 (2013).  "Confidential Information" shall also include information that does not necessarily constitute a "trade secret" as that term is defined in the Texas Uniform Trade Secrets Act , and that may be partly public or partly known to one or more persons such as regular customers, but is not collectively or generally known to the public or any one party, such as customer lists, aggregate or overall pricing lists, and overall pricing strategies, methodologies, algorithms, and data.  (d) Confidential Information does <u>not</u> include information that:  (i) was in Employee's possession through independent, non-confidential sources and without any violation of the Employee's obligations under this Agreement; (ii) is or becomes a matter of public knowledge through no fault or act of Employee; or (iii) is developed by another person independently of any disclosures made by Employee.

12.   **Non-Disclosure.**  During the term of Employee's employment by Hydradyne, Employee agrees not to use or disclose any of Hydradyne's Confidential Information for any purpose not specifically authorized by Hydradyne.  Upon termination of Employee's employment by Hydradyne, Employee agrees:  (a) not to take or remove any of Hydradyne's

Confidential Information, in any form, for any purpose, and (b) not to use or disclose, or allow the use or disclosure of, any of Hydradyne's Confidential Information by any third party, including but not limited to any business other than Hydradyne that is involved in the engineering, design, fabrication, sale, service, or repair of motion control and fluid power products and systems.

13.     **Legal Process & Confidential Information.**  If Employee receives a subpoena or other order, process, or papers from a court, regulatory body, or other governmental authority, or from a private party to any lawsuit or alternative dispute resolution procedure ("Legal Process") that Employee believes, in good faith, to demand the disclosure of Confidential Information, Employee shall promptly notify Hydradyne and allow Hydradyne to oppose or limit such Legal Process.  Employee shall cooperate fully with Hydradyne in seeking to oppose or limit any such Legal Process.

14.     **Injunctive Relief.**  Each party agrees that any actual or threatened violation of this Agreement would cause irreparable harm that cannot be remedied by monetary damages. Each party agrees that immediate, temporary, preliminary, and permanent injunctive or equitable relief is necessary and appropriate to halt or prevent any actual or threatened violation of this Agreement, as an exception to the otherwise mandatory arbitration provisions of this Agreement.

15.     **Assignment.**  Neither party may assign or transfer its rights or obligations under this Agreement without the other party's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed.  Notwithstanding the foregoing sentence, Hydradyne may assign or transfer all of its rights or obligations under this Agreement to any affiliate of Hydradyne or to any purchaser of all or substantially all of the assets or ownership interests of Hydradyne, without notice to Employee.  This Agreement shall inure to the benefit of, and shall be binding upon, the parties and their respective successors and assignees, if any.

16.     **Severability of Restrictive Covenants.**  To the extent that any provision or portion of this Agreement shall be held, found, or deemed to be unenforceable, then any such provision or portion of the Agreement shall be severed or modified to the extent necessary to be legally enforceable to the fullest extent permitted by applicable law.  Employee expressly authorizes any court or arbitral tribunal of competent jurisdiction to sever or modify any such provision or portion of this Agreement.

17.     **Governing Law.**  This Agreement shall be interpreted and enforced under the laws of the United States of America and the State of Texas, not including any conflicts of laws rules of Texas that would result in the application of the substantive laws of a jurisdiction other than Texas.

18.     **Arbitration.**  Any and all disputes involving Employee and Hyradyne, and arising out of or related to this Agreement or the subject matter of this Agreement, shall be resolved by arbitration and not by any court.  Any dispute involving the arbitrability of a dispute or issue arising out of or related to this Agreement shall also be decided by arbitration and not by a court.  The sole exception to arbitration shall be the right of either party to seek immediate injunctive relief or specific performance to halt or prevent any actual or threatened irreparable

harm, or to preserve the *status quo ante*, before or during arbitration. Arbitration shall be conducted as expeditiously as possible by a single JAMS arbitrator in Dallas, Texas, selected by mutual agreement of the parties or, failing such agreement, at the sole discretion of administrative personnel for JAMS. All arbitrations shall be conducted pursuant to the principles stated in the streamlines arbitration rules of JAMS (http://www.jamsadr.com/rules-streamlined-arbitration/). Arbitration shall be conducted such that the arbitrator's final decision is rendered within sixty (60) days after either party seeks to commence arbitration. Discovery in any arbitration shall be limited to the production of documents and limited depositions. An arbitration hearing shall not exceed one (1) day in duration. The arbitration hearing shall be conducted in Dallas, Texas or in any other site to which the parties mutually agree. The arbitrator shall render a written decision within five (5) calendar days after conclusion of the arbitration.

   19.   **Enforcement & Interpretation.** Employee agrees that he or she has been provided with an opportunity to: (a) review all terms and conditions of this Agreement, (b) obtain legal counsel and advice regarding this Agreement, and (c) request any changes to this Agreement deemed advisable by Employee or Employee's counsel. Employee therefore agrees that no provision of this Agreement shall be interpreted more strictly or less favorably against Hydradyne, as the drafter of this Agreement.

   20.   **General Provisions.** This Agreement is the parties' entire agreement regarding non-solicitation of customers, employees, and vendors, and non-disclosure of confidential and proprietary information. This Agreement supersedes and controls any prior or subsequent written or oral agreements, communications, or understandings with regard to that subject matter. The terms of this Agreement may only be modified in a writing signed by both parties. No indulgence extended by either party shall be construed as a waiver of any breach by the other party, nor shall any waiver of one breach be construed as a waiver of any rights or remedies with respect to any subsequent breach. If any provision of this Agreement shall be adjudged void, invalid or unenforceable by a court of competent jurisdiction, the remainder of the Agreement shall continue and remain in full force and effect.

By the signatures provided below, both parties warrant and represent that they have read, understood, and agreed to all terms and conditions of this Agreement.

Date: _4-6-19_

**Samuel Melendez ("Employee"):**

Signature _____

Witness Signature _____

Witness Signature _____

**Hydradyne:**

**Kimberly A. Clark**
Signature

**Kimberly A. Clark**
Name

**Human Resources**
Title

_____
Witness Name

_____
Witness Name